**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

KIERSTEN HENING,

        Plaintiff,

v.                          **CIVIL ACTION NO.  7:21-cv-00131**
                                  **Judge Thomas T. Cullen**

CHARLES "CHUGGER" ADAIR,

        Defendant.

## MEMORANDUM IN SUPPORT
## OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Hening brings this case against Virginia Tech women's soccer coach Charles "Chugger" Adair for First Amendment Retaliation. Hening quit the Virginia Tech women's soccer team. Hening quit after not starting, but playing in, two of the first three matches in the 2020 season. Hening started and played the entire first match at the University of Virginia ("UVA"). Hening played one-third of the match the next week at Clemson due to Coach Adair changing the lineup, and she played five minutes of the third match at the University of North Carolina ("UNC") a few days later. She quit upon the team's return to Blacksburg.[1] Hening filed this lawsuit due

---

[1] One of Hening's teammates, Alice Hamel, commented to a reporter about the Hening's lawsuit: "My initial reaction was, this girl doesn't start for two games and she's walking off the team? I haven't started in three years, girl." Mike Barber, *'This was not for her political views': Former Hokies player defends coach over handling of teammate who declined to kneel before games.* RICHMOND TIMES-DISPATCH (April 26, 2021), https://richmond.com/sports/college/this-was-not-for-her-political-views-former-hokies-player-defends-coach-over-handling-of/article_a47166d7-6012-5d05-af88-7f06a94fb4dd.html

to disappointment, and this case illustrates a disappointed athlete's attempt to "t[ie] loose ends together"  and form "independent conclusions" about why she did not start two of the three matches she played in the 2020 Virginia Tech women's soccer season. (K. Hening Dep. Tr. 62:7–13; 90:1–8, *attached as* **Exhibt A**). Despite Hening's independent conclusions and attempts to tie loose ends together, which have no evidentiary support, Coach Adair did not retaliate against Hening for any alleged First Amendment activity.

Hening claims the only explanation Coach Adair had for changing the starting lineups in the first three matches of the season must have been because she, and three other players stood during an ACC Unity Statement before the first match of the season at UVA. While Hening bases this case on speculation and her independent conclusions, the undisputed, material facts show that Coach Adair was not aware of her standing at the UVA match, and the lineup changes that followed were simply the result of a coach doing his job in trying to find a lineup that worked in a new season against new opponents. No evidence, including Hening's own testimony, supports Hening's independent conclusions. To the contrary, Hening's own witnesses contradict the allegations in her Amended Complaint.

Hening now asks the Court to order her reinstatement to the Virginia Tech women's soccer team after her hasty resignation and after she has graduated from Virginia Tech and enrolled in an unaffiliated nursing school. Without any evidence of a causal connection between Hening's alleged speech and any of the claimed adverse actions, Hening cannot maintain a claim for First Amendment retaliation.

Coach Adair's actions were Constitutional and consistent with the way he treated other players on the team and consistent with the basic coaching strategy of trying to find a lineup that worked against opposing teams. This Court should grant Coach Adair's motion for summary judgment and refrain from deciding starting lineups for coaches as Hening essentially asks it to do.

## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

On September 3, 2020, the ACC announced that all ACC schools would be required to read a "unity statement" before each match. The ACC did not provide any directives or guidance on standing or kneeling and did not indicate that the statement supported any particular social justice organization. (*Attached as* **Exhibit G**). The announcement stated in relevant part:

> CORE also has introduced a Unity Statement, which will be read at all ACC events: 'We, the ACC, are committed to seeing each other as equals, supporting each other, and treating each other with respect and dignity at all times, recognizing that our differences don't divide us, but they make us stronger.'

(*Id.*)

Coach Adair never instructed or expected anyone to kneel during the ACC Unity Statement or any other event. (**Ex. B**; **Ex. A** at 135:13–23). The team never discussed standing or kneeling during the ACC Unity Statement. (**Ex. A** at 137:9–145:9; **Ex. B** at 39:11–41:25). The UVA match was the first match of the season, and the first time either team had participated in the reading of the statement. (*Id.*).  The announcer read the statement just before kickoff with the starters on the field. When the UVA team began to kneel, some members of the Virginia Tech team

followed suit and some did not. (*Id*.). The match started as soon as the statement finished. (*Id*.).

Coach Adair did not see four of his players standing during the ACC Unity Statement before the UVA match on September 12, 2020. (C. Adair Aff., *attached as* **Exhibit B***;* M. Soto Dep. Tr. 65:20–25, *attached as* **Exhibit C**; **Ex. A** at 167:11–168:3). He likely would have never known had his operations director not told him before practice the following week. (**Ex. B**; **Ex. C** at 65:20–25). The operations director only mentioned the standing because she knew the team had been debating social issues in early September and was afraid it might reopen a debate among the team members regarding social issues. (**Ex. C** at 71:24–72:8). It did not. (*Id*.; E. Gray Aff., *attached as* **Exhibit E**). Standing or kneeling during the ACC Unity Statement did not resurface as an issue among team members. (*Id*.; K. Johnson Dep. Tr. 44:19–45:6, *attached as* **Exhibit D**; **Ex. E**). Some members stood during the statement before some matches and knelt during the statement before others. (**Ex. D** at 44:19–45:6; **Ex. E**; E. Steigerwald Aff., *attached as* **Exhibit F**)

The week before the UVA match, Coach Adair called a team meeting before practice after learning that the team was divided on social issues and what message to wear on warm-up jerseys. (**Ex. A** 121:1–125:16; **Ex. E**; **Ex. B** at Exhibit B; **Ex. C**). Coach Adair, without endorsing any social justice movement, asked the team to "walk in each other's shoes" and come up with a warmup jersey as a team. (**Ex. D** at 35:12–37:21; **Ex. B**; **Ex. E**.) He never suggested supporting Black Lives Matter or a logo or suggested replacing "Hokies" with the names of persons shot by the police.

4

(**Ex. A** at 124:20–129:11; **Ex. B**). The team eventually chose "#LOVE." (**Ex. E**).

<u>The UVA match</u>

UVA scored the first goal, but Coach Adair and other Virginia Tech coaches and players thought the scorer was offside. (**Ex. B** at Exhibit A). When Coach Adair questioned the official, the official stated that Hening had "dropped the line,"[2] which kept the scoring player onside.[3] (*Id*.). This call frustrated Coach Adair because Hening had a history of dropping the line and had been coached repeatedly to pay particular attention to that aspect of her game. (*Id*.).

During the first half, players Emily Gray and Emma Steigerwald recall Hening repeatedly yelling at and chastising her teammates and not following the game plan. (**Ex. E**; **Ex. F**). When Steigerwald was substituted in the first half, she informed the coaching staff that Hening was "doing her own thing" and "being selfish" by not following the game plan and telling other players what to do. (**Ex. F**).

<u>UVA halftime</u>

At halftime, Virginia Tech was down 1-0, and the coaching staff considered making some changes, including substituting Hening, but decided against it. Coach Adair asked his assistant to reiterate the game plan to Hening and the rest of the

---

[2] "Dropped the line" means a defensive player has moved closer to the goal and allowed an offensive player to get closer to the goal without the ball and ahead of the player with the ball without being offside.

[3] Under no circumstances should the discussion in this memorandum be taken as an attempt to blame the loss solely on Hening. Coach Adair has provided to the team, and will again to a jury if questioned, a thorough assessment of the highs and lows of the team and individual play. Hening's play is assessed in detail here simply because she has alleged that any criticism of her play or effort was unlawful. Coach Adair contends, and the depositions and affidavits support, that he provided on and off-field feedback to the players.

backline. (**Ex. B** at Exhibit A). In response to Hening's play and treatment of her teammates on the field, but without knowing Hening had stood during the ACC Unity Statement, Coach Adair stepped into the discussion and told Hening to stop "bitching and moaning" and "doing her own thing." (*Id*.). Coach Adair's statements to Hening at halftime were no better or worse than comments he had made to other players at halftime at UVA or other matches. (*Id*.; **Ex. D** at 42:25–44:18). Hening agreed Coach Adair had yelled at other players during halftime over the years. (**Ex. A** at 41:19–42:18).

UVA film session

Virginia Tech lost to UVA 3-1. Coach Adair thought Hening was partially responsible for the third goal because she failed to attack the player with the ball. (**Ex. B** at Exhibit A). The team film session following the UVA match was no different than any other team film session. (**Ex. E**; **Ex. F**; **Ex. D** at 45:7–46:8). Coach Adair and the rest of the coaching staff pointed out positive and negative team and individual play. (*Id*.). No witness other than Hening recalls Hening being criticized more than anyone else in that or other film sessions. (*Id*.). Hening testified that Coach Adair did not yell at the film session. (**Ex. A** at 98:16–100:23). She was just upset because she thought he repeatedly referred to her mistakes more than other players' mistakes. (*Id*.).

Clemson, UNC, and Hening quits

Hening played more in her freshman and sophomore years than she was ready for and the coaches had planned due to injuries to several other players. (**Ex.**

**B**). Hening always hustled, worked hard, played hard, and contributed to the team, but she did have some technical difficulties and did not always accept coaching well. (**Ex. B**). Hening acknowledged these issues in her "End of Season Questionaires." (End of Season Questionaires, *attached as* **Exhibit H**).

With the start of the 2020 season and the addition of new players, the coaching staff was looking for lineups that would work against tough ACC competition. (**Ex. B**). Hening agreed that Coach Adair often changed the lineups to align with different formations and to match up with opposing teams. (**Ex. A** at 33:14–35:1).

When Hening learned she would not be in the starting lineup for the Clemson match on September 17, she asked Coach Adair about the decision. (**Ex. A** at 145:20–149:8). He told her that she "shouldn't read into it and [to] keep working hard and they [coaching staff] were just trying stuff out." (*Id*.). Hening considered quitting upon receiving the news that she would not start, stating in text messages with her father: "If I don't play tonight I'm checking the box and I will be done. Just thought you and mom should know." (Sterling Hening Texts, *attached as* **Exhibit I**). In an exchange with her mother that same day, Hening dismissed Coach Adair's explanation of why she did not start:

> Told 'not to stew on it and be ready' nothing is set in stone
> and they're trying things out they don't know what
> they're doing and what's best. They said that I need to try
> to get forward more, stay with the line and a bunch of
> stupid shit like that. Said I got cut a few times as if other
> people didn't a thousand times as well. Brought up Kelsey
> Alia those players didn't come out I don't understand why

> I am and they just say that I'm not always receptive of what they ask of me sometimes and I literally told them I bust my ass I try to do everything in my power and everything y'all ask of me and I don't mean to be defiant or stubborn at all and I watch film and try to work on things.
>
> They say my work ethic and commitment to defending and tenacity is what's kept me in the mix and is a large part of why I play significant minutes
>
> I told them I was pissed and hurt and it was a slap in the face and I want an opportunity
>
> Told them I'm no bullshit I cake [sic] straight to the source
>
> I'm not someone who's going to sit back and take it
>
> I have to be better in possession going forward and getting forward I don't know how I'm expected to do that or prove that in a 3-6-1.

(Sonja Hening Texts, *attached as* **Exhibit J**).

Hening played one-third of the Clemson match, which Virginia Tech lost 3-0. (**Ex. B**).

Virginia Tech next faced number one ranked UNC on September 20. (*Id.*). Hening did not start, but did play 5 minutes as a substitute, and Virginia Tech lost 1-0. (*Id.*). While Hening considered quitting after the Clemson match, she quit upon her return to Blacksburg from UNC, after playing in, but not starting, two matches. (**Ex. A** at 153:14–19). Had Hening remained on the team, she would have played throughout the rest of the season. (**Ex. B**).

<u>Hening makes independent conclusions and ties loose ends</u>

After she quit on September 20, Hening provided essentially the same rationale to everyone who inquired about her decision: team environment,

disrespect, personal health and well-being. (**Ex. A** at 159:14–160:11). Hening testified that she started making "independent conclusions" after the UVA film session because she disagreed with Coach Adair's assessment of her play. (*Id.* at 63:20–67:23; 161:9–19). Her theories about the lineup change expanded after a text message exchange with Marc Mullen, the sports information director, on September 22 when he asked if "outside forces" had caused her to quit. (*Id.*). She asked if he thought it was her political views. (Marc Mullen Texts, *attached as* **Exhibit K**). Mullen responded that "he couldn't say one way or the other . . . Nothing was said to me Monday other than take you off the roster." (*Id.*). Hening drew her own independent conclusion about the phrase and alleged in her Amended Complaint that "By 'outside forces,' he meant BLM and the controversy over Hening's opposition." (ECF No. 7 at ¶ 37).

In his affidavit and when deposed; however, Mullen completely refuted the interpretation of his quote, stating directly and emphatically:

- What I wrote to her regarding her decision to quit was "I just *hope* it isn't based on 'outside' forces that have been brought inside the program." [emphasis in original]
- My comment was referring to the possibility of divisions between players over social-justice issues in the summer of 2020 and Hening's ability or inability to stay on the team because of these conflicts.
- In no way was my comment in reference to Coach Adair.
- To this day, I do not know the social justice position of Coach Adair.

(M. Mullen Aff., *attached as* **Exhibit L**.).

> If I had that information and I was trying to, you know, get back at Chugger or whatever, whatever, I would have said, 'Yes, I believe you were targeted,' but that's not what I said. I said I don't know . . . You are literally taking the quote out to – fit what you wanted to, and like I said, I'm trying to answer these questions to the best of my knowledge, but I – I knew this stuff was going to come out and it's --it's infuriating that it's come down to this, and again, like I said, I was misquoted, or the information was –
>
> . . .

(M. Mullen Dep. Tr. 126:13–127:5, *attached as* **Exhibit M**).

> . . .
>
> I had never knew why she left the team, because I mean, at this point in the text message on the 22nd when she's talking about being – social/political beliefs, in my opinion, she's gone into an avenue that I was not even considering, and so when I wrote that, I was just like, if that's why she left and she thought she was targeted or anything like that, I had no knowledge of any of that and I wasn't going to continue down that road because that's not somewhere where I was interested in – in – taking the conversation, if that makes sense.

(*Id.* at 130:16–131:3).

Mullen, who attended the UVA match, did not know that Hening had remained standing during the ACC Unity Statement. (**Ex. M** at 115:23–116:6). Other than Mullen's text and Hening's evaluation of her own play, Hening has no other basis for her assertion that Coach Adair retaliated against her for standing during the ACC Unity Statement. (**Ex. A** at 63:20–64:12; 67:12–68:4; 161:9-19). No one has ever told her that Coach Adair retaliated against her for standing. (**Ex. A** at 66:12–19). Hening drew her own independent conclusions. (**Ex. A** at 63:20–64:12;

67:12–68:4; 161:9-19).

The other players who stood

Hening contends that her decision to stand during the ACC Unity Statement at UVA was the motivation for the lineup change; however, Karlie Johnson and Emma Steigerwald, who both stood, placed in the top ten for minutes played on the team during the 2020 season. (**Ex. A** at 97:12–98:12).[4] Both testified that standing or kneeling was not an issue with Coach Adair and did not reduce their playing time. (**Ex. D**; **Ex. F**). The fourth player, Ava Vieth, was a freshman, and she saw playing time throughout the season. *See* Footnote 1. Hening's independent conclusions and attempts to tie loose ends together turn out to be purely based on her opinions and beliefs, not evidence. (**Ex. A** at 66:1–68:4).

## PROCEDURAL HISTORY

The sole claim before this Court is Hening's First Amendment Retaliation claim in the Amended Complaint. (ECF No. 7.)  The claim is asserted against Coach Adair in both in his official and individual capacity as the head coach of Virginia Tech's women's soccer team.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

---

[4] The Virginia Tech women's soccer cumulative statistics regarding playing time are available online only at https://hokiesports.com/sports/womens-soccer/stats/2020.

R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). The nonmoving party must "show that there is a genuine dispute of material fact . . . by offering sufficient proof in the form of admissible evidence." *Id*. (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Id*. "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

The moving party bears the burden of establishing that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, then the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, it must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant. *Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cnty, Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

## FIRST AMENDMENT RETALIATION

To present a triable claim of First Amendment retaliation, Hening must present evidence that "(1) [she] engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected [her] First Amendment rights, and (3) there was a causal relationship between [her] protected activity and the defendants' conduct." *Buxton v. Kurtinitis*, 862 F.3d 423, 427 (4th Cir. 2017). While not conceding that Hening engaged in protected First Amendment activity, for the purposes of this motion and memorandum, Coach Adair argues that Plaintiff cannot prove elements (2) and (3).

## ARGUMENT

Hening cannot present a triable claim of First Amendment Retaliation because even if Hening can show she engaged in protected First Amendment activity she cannot show that "defendant took some action that adversely affected [her] First Amendment rights" or that "there was a causal relationship between [her] protected activity and the defendant's conduct." *Constantine*, 411 F.3d at 499. Simply stated, Hening cannot show Coach Adair was aware of her standing during the ACC Unity Statement or took any action based upon Hening's political views. In addition, Hening was never instructed by anyone to "take a knee." She cannot show that changing a lineup affected her First Amendment Rights, or that "but-for" her standing during the ACC Unity Statement, Coach Adair would not have changed the lineup for the Clemson and UNC matches. Her arguments also fail because her other teammates who stood during the ACC Unity Statement suffered

no alleged adverse consequences.

Hening essentially asks this Court to second guess Coach Adair's match preparation and coaching strategies. At least one court has cautioned against this approach: "The courts should not get involved in second guessing a coach's decision to play one person over another. Federal judges issue opinions and orders, not starting line-ups. *Rutherford v. Cypress-Fairbanks Indep. Sch. Dist.*, 1998 WL 330527, at *5 (S.D. Tex. Feb. 25, 1998).

Hening's claims are based on her own "independent conclusions" and attempts to "tie loose ends together," both of which are based on her own speculation and fail to show any actionable conduct on the part of Coach Adair. *See Gilliam v. S.C. Dep't Of Juvenile Justice*, 474 F.3d 134, 142 & n.9 (4th Cir. 2007) (affirming grant of summary judgment where "[t]he few specific examples" of purportedly disparate treatment motivated by race "were not supported by any evidence other than [plaintiff's] own general statements, which often lacked detail"); *Hawkins v. PepsiCo. Inc.*, 203 F.3d 274, 280-81 (4th Cir. 2000) (affirming summary judgment on hostile work environment claim under 42 U.S.C. 1981 where plaintiff did "nothing more than speculates" that she was fired because of race); *Evans v. Technologies Applications & Service Co.*, 80 F.3d at 959 (A plaintiff's "own naked opinion, without more, is not enough to establish a *prima facie* case of discrimination[.]") (internal quotation marks and alterations omitted);

## I.   Changing a team lineup while still providing playing time does not constitute adverse action.

Hening concedes that Coach Adair regularly commented on players'

performances and changed lineups and formations to match the strengths of Virginia Tech's opponents. To prove that Coach Adair took an action that adversely affected her First Amendment rights, Hening must demonstrate that Coach Adair's normal practices "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)(quoting *Washington v. Cnty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004)). This test "focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000). Only the reasonably foreseeable adverse effects of an action are relevant for the purposes of this analysis. *See Siggers-El v. Barlow*, 412 F.3d 693, 702 (6th Cir. 2005); *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002).

Hening's claims arise out of the first three matches of the 2020 season when team lineups and the ACC Unity Statement were new. Hening's Amended Complaint attempts to conflate kneeling during the national anthem with standing during the ACC Unity Statement. She does this in an attempt to prove she meets the first element of the retaliation test – engaging in protected activity. The conflation also attempts to mask the informality haphazard way the ACC Unity Statement was introduced to players and executed at the UVA match.

Unlike the national anthem, the ACC Unity Statement had no tradition of standing or kneeling because it was new for the 2020 season. The players learned

15

that the ACC Unity Statement would be read as they boarded the bus to travel to Charlottesville for the match. They were never given any direction on what to do during the reading of the statement. They simply followed the lead of the UVA players and coaches. Some Virginia Tech players took a knee and others, including Hening, remained standing.

Hening contends that had she not remained standing, she would not have been criticized at halftime or during film sessions and Coach Adair would not have changed the starting lineup. She and other players, however, acknowledge that Coach Adair routinely called out players for their performance at halftime and during film sessions and that he changed the starting lineup based on opponents. Also, the other players who stood received no adverse action. Hening essentially argues that by standing for the required ACC Unity Statement, she must start and play the same number of minutes for each future match or else she is the victim of adverse action. As a player of "ordinary fitness," she contends that the criticism of her play and the lineup changes, both of which were common occurrences prior to her standing before the UVA match, would deter her from "the exercise of First Amendment rights." *Constantine,* 411 F.3d at 500.

Hening was not benched. Hening was not dismissed from the team. Hening played one-third of the match at Clemson, and wanted to quit before and after. She played five minutes at UNC and quit. Hening does not contend that she was the only team member who received criticism. She contends that Coach Adair's lineup decisions were "adverse" simply because they involved her.

II.   **Even if the halftime comments, film session comments, and lineup change qualify as adverse actions, Hening cannot show that Coach Adair took those acts to retaliate against her protected speech.**

Hening must show that Coach Adair desired to retaliate against her for her speech and that this desire was the but-for cause of his actions. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *see also Hartman v. Moore*, 547 U.S. 250, 257 (2006). Because there are many constitutionally permissible responses to protected speech, "[t]he causation element in retaliation claims asks whether the considerations which animated the defendant's conduct were permissible or impermissible." *Martin v. Duffy*, 977 F.3d 294, 300 (4th Cir. 2020). Hening cannot make out a claim of First Amendment retaliation if nonretaliatory factors were sufficient to justify the allegedly adverse actions. *See Nieves*, 139 S. Ct. at 1722. As discussed herein, lineup changes and comments about play are normal activities for a coach and, therefore, nonretaliatory factors.  Coach Adair is entitled to judgment as a matter of law.

Hening cannot show that Coach Adair desired to retaliate against her for her speech and that this desire was the but-for cause of his actions. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *see also Hartman v. Moore*, 547 U.S. 250, 257 (2006). Hening cannot produce any evidence that Coach Adair ever had any intention to retaliate against her for her speech. He never mentioned her standing or political beliefs to her or anyone else. The halftime and film session comments of which she complains were strictly tied to her performance and not about her standing or political beliefs. Coach Adair's rationale for the lineup change prior to

the Clemson match did not mention standing or politics; instead, it focused on themes Hening had heard in prior seasons and with which she disagreed. Some of the themes she even acknowledges in her self-evaluation. The Court should also note that the lineup change resulted in Virginia Tech giving up one goal at UNC, the number one ranked in the country at the time, instead of the three goals given at UVA and Clemson. As a result, even if the halftime comments, film session comments and lineup changes were adverse actions, Hening's inability to show but-for causation still entitles Coach Adair to judgment as a matter of law.

### III. Mere allegations of temporal proximity between any particular action and protected speech are insufficient to withstand a motion for summary judgment.

Lacking any admissible, nonspeculative evidence to support any causation argument, Hening is left with mere temporal proximity between standing during the ACC Unity Statement and Coach Adair's alleged "Retaliatory Conduct." Her temporal proximity argument is insufficient to survive a motion for summary judgment. *Bhattacharya v. Murray*, 515 F. Supp. 3d 436, 457 (W.D. Va. 2021); *see Nieves*, 139 S. Ct. at 1722 (requiring affirmative proof of a causal relationship between a defendant's animus and plaintiff's injury). At the summary judgment stage, "independent conclusions" and "tying loose ends" and other inferences of motive based merely on temporal proximity cannot sustain the "fact-intensive arguments about causation" that are required at summary judgment. *Id.* at 459. At this stage of the action, Hening must provide the Court with sufficient affirmative evidence of retaliatory animus and but-for causation to proceed to trial. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Hening has no such evidence here. Coach Adair explained his reasons for the lineup changes, and other players confirmed that Hening was "bitching and moaning" and "doing her own thing" during the UVA match.

## IV.   Coach Adair is entitled to qualified immunity in his individual capacity because his individual conduct did not violate a clearly established right.

Coach Adair is entitled to summary judgment for an additional reason: Hening cannot show that his individual conduct violated a clearly established right. Consequently, the doctrine of qualified immunity provides him in his individual capacity "with an immunity from the burdens of trial as well as a defense to liability." *Johnson v. Fankell*, 520 U.S. 911, 915 (1997). Regardless of the outcome of any claims against him in his official capacity, Coach Adair is entitled to judgment as a matter of law in his individual capacity.

The doctrine of qualified immunity adds an additional layer of nuance to the summary judgment analysis. Overcoming a qualified immunity defense at summary judgment requires Hening to show not only that a violation of her constitutional right occurred, but that right at issue was "'clearly established' at the time of the Coach Adair's alleged misconduct." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). The district court may exercise its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson*, 555 U.S. at 236.

In determining whether a right is "clearly established," the Supreme Court

and the Fourth Circuit both "have admonished that 'courts must not define clearly established law at a high level of generality.'" *Doe ex rel. Watson v. Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d 690, 713 (W.D. Va. 2018) (quoting *E.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018)). It is insufficient, in other words, to observe as a broad proposition that the First Amendment guarantees freedom of speech, or that university students generally have First Amendment rights. "The dispositive question is [instead] 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (emphasis in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). To conclude that this "particular conduct" violated a clearly established right, "existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). Hening, therefore, can defeat Coach Adair's qualified immunity defense if she can identify "a case where [a coach] acting under similar circumstances as [Coach Adair] was held to have violated the [First] Amendment." *Hunt v. Bd. of Regents of Univ. of N.M.*, 792 F. App'x 595, 606 (10th Cir. 2019) (alterations in original) (quoting *White*, 137 S. Ct. at 552). She cannot do so here.

There is simply no case law that holds that a coach who criticizes a player at halftime and film sessions and changes the lineup in the first few matches of the season has violated a "clearly established" right. Coach Adair should receive summary judgment on the basis of qualified immunity for the individual capacity claims.

## **CONCLUSION**

Coach Adair contends the alleged retaliatory actions are not adverse actions, and Hening's speech is not the but-for cause of any of the alleged adverse actions. Coach Adair is entitled to qualified immunity because his individual conduct did not violate a clearly established right.

Coach Adair, by counsel, respectfully requests this Court to enter an Order granting summary judgment for him in his official and individual capacity, dismiss this case with prejudice, and award him his costs and any other such relief this Court deems just and necessary.

Respectfully submitted,

CHARLES "CHUGGER" ADAIR


By:        s/ M. Hudson McClanahan
           Counsel for Defendant Charles "Chugger" Adair

Kay Heidbreder (VSB No.: 22288)
University Legal Counsel and
Senior Assistant Attorney General
heidbred@vt.edu

M. Hudson McClanahan (VSB No.: 46363)
Associate University Legal Counsel and
Assistant Attorney General
hud3@vt.edu


Mark A. Gess (VSB No.: 71016)
Associate University Legal Counsel and
Assistant Attorney General
mgess@vt.edu

University Legal Counsel
236 Burruss Hall (0121)
800 Drillfield Drive
Blacksburg, VA   24061
Phone:  (540) 231-6293
Fax:  (540) 231-6474

## CERTIFICATE OF SERVICE

I hereby certify that, on this 28th day of October, 2022, the foregoing MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing (NEF), to the following:

Jeffrey M. Harris
Cameron T. Norris
Michael Connolly
Jim McGlone
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd. Suite 700
Arlington, VA  22209
(703) 243-9423
jeff@consovoymccarthy.com
cam@consovoymccarthy.com
mike@consovoymccarthy.com
jim@consovoymccarthy.com
*Counsel for Plaintiff*

Adam K. Mortara (*pro hac vice*)
Lawfair LLC
40 Burton Hills Boulevard, Suite 200
Nashville, TN  37215
(773) 750-7154
mortara@lawfailllc.com
*Counsel for Plaintiff*

_____
s/ M. Hudson McClanahan
Counsel for Defendant Charles "Chugger" Adair