IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

KIERSTEN HENING,                                )
                                                )
        Plaintiff,                           )     Case No. 7:21cv00131
                                                )
v.                                              )     **MEMORANDUM OPINION**
                                                )
CHARLES "CHUGGER" ADAIR, in his )     By:    Hon. Thomas T. Cullen
individual and official capacity as head        )             United States District Judge
head coach of the women's soccer team   )
at Virginia Polytechnic Institute and State )
University,                                     )
                                                )
        Defendant.                          )

---

Plaintiff Kiersten Hening, a former member of the Virginia Tech women's soccer team,

filed this suit under 42 U.S.C. § 1983 against her former coach, Charles "Chugger" Adair.

Specifically, Hening alleges that, after she refused to kneel in support of social-justice

initiatives, including Black Lives Matter ("BLM"), prior to the team's 2020 season opener

against the University of Virginia ("UVA"), Adair retaliated against her in violation of the First

Amendment. According to Hening, as a direct result of her refusal to kneel while a "Unity

Statement"[1] was read over the loudspeakers, Adair berated her at halftime in front of her

---

[1] On September 3, 2020, the Atlantic Coast Conference's ("ACC") Committee for Racial and Social Justice
announced that, in addition to creating an ACC Unity Symbol and implementing mandatory "diversity and
inclusion training for student-athletes" focused on "anti-racism," a Unity Statement would be read before every
ACC event. This Unity Statement provided: "We, the ACC, are committed to seeing each other as equals,
supporting each other, and treating each other with respect and dignity at all times, recognizing that our
differences don't divide us, but they make us stronger." (ACC September 3, 2020 press release,
https://theacc.com/news/2020/9/3/general-acc-committee-for-racial-and-social-justice-announces-three-
new-initiatives.aspx (last visited Dec. 1, 2022).) As this Unity Statement was read prior to the UVA game, all
but three of the players and coaches from both teams kneeled in an apparent show of support. Hening and two
of her teammates declined to kneel.

teammates, and again at a film-review session the following week, for "bitching and moaning" and "doing [her] own thing." (Kiersten Henning Dep. 54:4–7, May 20, 2022 [ECF No. 21-1].) Adair, on the other hand, claims that he was unaware until after the UVA game that Hening had declined to take a knee and that his vocal criticism of Hening at halftime and the following week—during which he never directly mentioned the Unity Statement or her refusal to kneel—was based solely on her poor play. Hening, who had been a major on-field contributor for two years prior to the 2020 season, also asserts that Adair removed her from the starting lineup for the next two games and drastically reduced her playing time in those games because she had engaged in this protected First Amendment activity. As a result, Hening resigned from the team after the third game of the season.

Adair has filed a motion for summary judgment. He argues that Hening has not presented a triable claim of First Amendment retaliation because she has failed to establish two of the claim's three elements: (1) that Adair took some action that adversely affected Hening's First Amendment rights; or (2) that there was a causal relationship between Hening's refusal to kneel and Adair's subsequent actions toward her. This motion has been fully briefed by the parties, and the court heard oral argument on December 2, 2022. For the following reasons, the court will deny Adair's motion and allow the case to proceed to trial.

## ANALYSIS

### A. Summary Judgment Standard

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v.*

*EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (internal citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)) (cleaned up). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

### B. First Amendment Retaliation

Hening alleges that Adair violated her First Amendment right to free speech by retaliating against her for declining to kneel prior to the UVA game. It is well-established that the First Amendment's protection of freedom of speech includes "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *W. Va. St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 633–34 (1943)). As a necessary corollary to protect that fundamental right, the "right of free speech includes . . . the right to be free from retaliation by a public official for the exercise of that right." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (quoting *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir. 2000)). To establish a claim for First Amendment retaliation, Hening must put forth sufficient evidence that: (1) she engaged in protected First Amendment activity; (2) Adair took some action that adversely affected her First Amendment rights; and (3) there was a causal relationship between her protected activity and Adair's actions. *Id.*

For purposes of his motion for summary judgment, Adair does not challenge that Hening engaged in protected First Amendment activity by declining to kneel prior to the UVA game. But he argues that Hening has not presented a triable claim of retaliation because the undisputed evidence demonstrates that he did not take any action that adversely affected her First Amendment rights, and that, even if she has, there is no causal connection between her refusal to kneel and his subsequent coaching decisions. The court will address these arguments in turn.

### 1.  Adverse Action

The court concludes that there is sufficient evidence in the record supporting Hening's claim that Adair's actions, whatever his motives, adversely affected her First Amendment rights. In making this determination, the court applies an objective standard, asking whether "the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Id.* at 500 (collecting cases). In so doing, the court can consider how the alleged retaliation personally affected the plaintiff. But "[w]hile the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity, it is not dispositive." *Id.* Moreover, "[n]ot all retaliatory conduct tends to chill First Amendment activity[,] . . . and a plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a '*de minimis* inconvenience' to her exercise of First Amendment rights." *Id.* (quoting *ACLU of Md., Inc. v. Wicomico Cnty., Md.*, 999 F.2d 780, 786 n.6 (4th Cir. 1993)).

A reasonable jury could find that Adair's conduct towards his former player constituted an adverse action for purposes of her First Amendment retaliation claim. Adair contends that

his halftime criticism and comments at the later film-review session were justified based on Hening's poor play and were unrelated to her pregame refusal to kneel. But as Hening points out, this argument misses the mark because it impermissibly assumes that Adair's version of the facts—specifically, that his criticism was motivated by Hening's purported on-field struggles rather than her pregame actions—is true.[2] At the summary judgment stage, the court cannot make this credibility determination in Adair's favor; its determination is solely within the province of the jury.

Moreover, Adair's argument conflates adverse action with causation. Whatever his motivations, the court has no trouble concluding that Adair's conduct towards Hening—publicly chastising her, removing her from the starting lineup, and reducing her playing time—would tend to chill a person of ordinary firmness's exercise of her First Amendment rights.[3] Indeed, Hening has testified that Adair's actions caused her to take a knee prior to the second (Clemson) and third (University of North Carolina at Chapel Hill) games of the season before she decided to quit the team. (Hening Dep. 144:5–145:2.) A reasonable jury, in sum, could find that Adair's actions reasonably chilled Hening's First Amendment expression.

---

[2] Hening has indicated that she intends to use James Maddux as an expert witness in the game of soccer—with specific experience playing and coaching college soccer—to rebut Adair's position that he benched her because she was playing poorly. (*See* Pl.'s Opp. to Def.'s Mot. to Exclude Exp. Wit. at 1 [ECF No. 33].) Adair has moved to exclude Maddux as an expert (*see* ECF No. 23), and that motion is pending. With or without Maddux, there is a genuine issue of material fact as to whether Adair's criticism of Hening's play was justified, which impacts on the causation element of Hening's retaliation claim.

[3] Although Hening was not on an athletic scholarship and there is no evidence that she had higher aspirations in her chosen sport, the type of retaliatory conduct alleged here would certainly have a chilling effect on college athletes generally, especially those who rely on scholarships to offset (or cover) their academic expenses or those that recognize that playing time and visibility will affect their future prospects in the sport or otherwise. For example, a line on one's résumé that reads "4-year state Division I soccer player" is preferable to "member of Division I soccer team."

### 2. Causation

But to prevail on her retaliation claim, Hening must also establish the requisite causal connection between her refusal to take a knee—i.e., her protected First Amendment activity—and Adair's alleged adverse actions towards her. This is a high hurdle, and "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). *Nieves*, in other words, clarifies that the alleged retaliatory motive must be a "but-for" cause, meaning that the plaintiff must prove that the defendant would not have taken the adverse actions against her absent his retaliatory motive. *Id.* (citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006)); *see also Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020) (noting that, "[o]ften, events have multiple but-for causes"). Thus, even if Hening establishes that a retaliatory motive played a role in Adair's actions, the court must still grant him summary judgment if it is undisputed that Adair would have taken the same actions towards Hening regardless of what she did (or did not do) prior to the UVA game. *See Nieves*, 139 S. Ct. at 1722.

Genuine issues of material fact preclude the court from granting summary judgment on this score. As a threshold matter, Adair claims that there is no evidence that he was even aware that Hening stood during the Unity Statement when he harshly criticized her at halftime, but this is belied by the record. Still photographs from the game film clearly depict Adair, who is kneeling on the sideline, looking in Henning's direction as she remained standing:[4]

---

[4] In his reply brief, Adair argues that the still photograph from the UVA game film is inadmissible "for the simple reason that Hening is not in the photograph." (Def.'s Reply Br. at 8 [ECF No. 37].) The court disagrees. Hening has established that these still photographs are authentic and relevant. The proponent of an exhibit "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The proponent of a photograph typically clears this "low bar" to admissibility by testifying that she recognizes the photograph, explaining how she recognizes it, and attesting that it is a fair and accurate





(Pl.'s Ex. 4 at 2–3 [ECF No. 35-4].)

---

depiction. *See, e.g.*, *United States v. McDaniel*, 433 F. App'x 701, 704 (10th Cir. 2011) (noting that "Rule 901 sets a low bar for admissibility"); *Wells v. Liddy*, 37 F. App'x 53, 63 (4th Cir. 2002) ("The burden to authenticate evidence under Rule 901 is not a high one. Once this requisite prima facie showing has been met, if the evidence satisfies all other rules of admissibility, the '[r]esolution of whether evidence is authentic calls for a factual determination by the jury.' (quoting *United States v. Branch*, 970 F.2d 1368, 1370 (4th Cir. 1992))). There is no requirement that the proponent of a photograph actually be in it, as long as she was present when the photograph was taken or is otherwise familiar with what is depicted based on prior observations or experience. Since Hening was standing just outside the frame when the video from which these still images were taken was made, she has satisfied these foundational requirements. And insofar as Hening will testify that she was standing just outside the frame on the left, and at least one of the photographs clearly depicts Adair, who is kneeling, looking in that direction, it has the tendency to make it more probable that Adair saw her standing during the "Unity Statement." Fed. R. Evid. 401; *see also* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.").

Adair also contends that Hening's theory of causation is, at bottom, based on rank speculation and self-serving conclusions, both of which, he argues, are insufficient to defeat summary judgment. But a fair review of the record indicates that Hening's case is based on more than supposition; indeed, ample circumstantial evidence undergirds her claim and gives rise to genuine issues of material fact about Adair's true motives and actions. The close temporal proximity between the pregame incident and Adair's halftime tirade against his starting defender (approximately 45 minutes) suggests some causal connection between these two events. *See Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017) ("In retaliation cases, a causal connection may exist where the employer takes adverse employment action against an employee shortly after learning of the protected activity."); *Flanagan v. Scearce*, No. 7:19-cv-00413, 2021 U.S. Dist. LEXIS 180353, at *21 (W.D. Va. Sep. 22, 2021) ("[T]he temporal proximity of Flanagan's speech on August 15, 2018, and her termination on August 30, 2018, is sufficient to create a genuine issue of material fact as to whether Flanagan's speech was the but-for cause of her termination."). And the close temporal proximity between the other alleged adverse actions (harshly criticizing Hening's performance during a film session and removing her from the starting lineup for the Clemson and UNC games) occurred within two weeks of Hening's refusal to kneel before the UVA game.

Hening also points to evidence showing that, in the late summer of 2020, the Virginia Tech women's soccer team, like many organizations and groups, was divided over whether and how to publicly support various social-justice initiatives (including BLM) in the aftermath of the murder of George Floyd. Indeed, an apparent rift had developed over this issue between a large group of team members (mainly freshmen) who openly embraced BLM and a few

upperclassmen who did not, causing the freshmen to complain directly to Adair about what they perceived as racism. (Pl.'s Ex. 15 [ECF No. 35-15]; Allyson Brown Dep. 14:3–15:24, Oct. 18, 2022 [ECF No. 35-7]; Karlie Johnson Dep. 31:5–32:3, 33:9–34:16, Sept. 26, 2022 [ECF No. 35-14]; Kiersten Hening Decl. ¶ 14, Nov. 18, 2022 [ECF No. 35-1].) Adair later addressed this apparent rift over BLM in at least two team meetings during the preseason. Prior to one, he texted his coaching staff that "some discussion . . . regarding Black Lives Matter and racial . . . injustice" had already occurred and that some members of the team "were open and speaking[,] which is great," but that "some others made side comments later on that struck a nerve with other people." (Pl.'s Ex. 13 [ECF No. 35-13].) In off-the-record comments to ACC Network broadcasters prior to the season (which were overheard by a Virginia Tech sports information official), Adair lamented this divide and his team's lack of consensus on how to support social-justice initiatives. (Marc Mullen Dep. 44:9–48:22, Sept. 15, 2022 [ECF No. 35-8]; Pl.'s Ex. 9 at 7 [ECF No. 35-9].) All of this suggests that this apparent BLM- and social-justice divide was far more significant to Adair at the time than he would have the court believe today.

Hening suggests that the "side" of this issue that Adair considered "open" and "great" was the pro-BLM side, and that the small group making "side comments later on that struck a nerve" was the anti-BLM contingent with which she aligned. Although no direct evidence supports this assertion, there is circumstantial evidence from which a reasonable jury could infer it. At a team meeting the following day, Adair encouraged his players to reach a consensus on how to show support for social justice, at one point suggesting that they wear special warm-up jerseys. (*See* Hening Dep. 121:13–126:18; Brown Dep. 17:1–18:14.) Immediately after that

team meeting, Adair allegedly made snide remarks about the family of one of his players'

preference for "All Lives Matter" as opposed to "Black Lives Matter." (Pl.'s Ex. 11 at 3 [ECF

No. 35-11].) The student manager who overheard Adair make these comments to the other

coaches immediately reported it to the small group of players who were opposed to supporting

BLM publicly. And it was no secret among the players and coaching staff that Hening was an

outspoken conservative and supporter of former President Donald Trump. (Brown Dep.

12:9–13.; Macaulay Soto Dep. 29:8–20, July 25, 2022 [ECF No. 35-12].) Macaulay Soto, the

Director of Operations for the women's soccer team and a BLM supporter, recalled that

Hening "was the only one who consistently posted a lot of [conservative] things on her social

media." (Soto Dep. 30:21–31:9.) The evidence of Adair's apparent views on this issue (as

reflected in his alleged criticism of "All Lives Matter" supporters) and Hening's well-known

conservative leanings and lack of support for BLM further support an inference that Adair

had a retaliatory motive when he criticized, and later benched, Hening for refusing to kneel

during the Unity Statement.

Even though this evidence establishes genuine issues of material fact as to Adair's

motives, he would still be entitled to summary judgment if he could prove "by a

preponderance of the evidence that [he] would have reached the same decision . . . even in the

absence of the protected conduct." *Mt. Health City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274,

287 (1977). In other words, if the weight of the evidence backs his assertion that he would

have chastised and benched Hening for her poor play against UVA regardless of her decision

not to kneel, then he would still be entitled to summary judgment. But the weight of the

evidence does not cut in Adair's favor, at least at this stage.

The record establishes that Hening was a stalwart defender on the women's team for two years prior to the 2020 season. She started nearly 40 games prior to the UVA game, including all but three as a freshman, and typically played most of the minutes of those games. (*See* Pl.'s Ex. 3 [ECF No. 35-3].) But Adair benched her after the UVA game and drastically reduced her playing time. As a freshman, Hening averaged 76 minutes of playing time; as a sophomore, nearly 88. (*Id.*) But during the Clemson game, Hening only played 29 minutes, and, at the UNC game, just 5. (Hening Decl. ¶¶ 25–26.) Ultimately, Adair may convince a jury that this coaching decision was based solely on Hening's poor play during the UVA game, but the court, viewing the evidence in the light most favorable to Hening, cannot reach that conclusion as a matter of law.

Similarly, Adair contends that Hening's circumstantial evidence of his alleged retaliatory motives is of no consequence because he did not take any action to retaliate against the two or three other women who joined her in not taking a knee before the UVA game. In other words, Adair claims that Hening's retaliation claim fails as a matter of law because she is unable to point to a similarly situated comparator who suffered the same fate.

Again, his argument misses the mark. As the Fourth Circuit has recognized (albeit in the context of Title VII), once a plaintiff offers circumstantial evidence of a discriminatory motive, "the case must be decided by the trier of fact and cannot be resolved on summary judgment." *Haynes v. Waste Connections, Inc.,* 922 F.3d 219, 225 (4th Cir. 2019). This is not to say that Adair's apparent non-retaliation against other players would not be relevant or admissible at trial to show that his actions towards Hening were not retaliatory; they likely would be, and the jury might find this evidence compelling. "But at the summary-judgment

stage, these additional facts and attendant inferences in favor [of the defendant] do not vitiate

the genuine questions of material fact" that Hening, for the reasons explained above, has

established to support her claim. *Barnett v. Roanoke Cty. Sch. Bd.*, Civil Action No. 7:20-cv-

00663, 2021 U.S. Dist. LEXIS 228823, at *37-38 (W.D. Va. Nov. 30, 2021). "The issue—at

this stage of the proceeding—is whether those additional facts permit the court to draw a

determinative inference [in Adair's] favor that [his] motives were not discriminatory." *Id.* On

this mixed record, the court concludes that they do not, and that Adair is not entitled to

summary judgment.

### C.  Qualified Immunity

Adair also briefly mentions the doctrine of qualified immunity, arguing that, even if

Hening has demonstrated that his conduct was unconstitutional, she has not shown that it

violated a clearly established right, and he is therefore still entitled to summary judgment. This

argument fails.

It is well-established that qualified immunity protects public officials "who commit

constitutional violations but who, in light of clearly established law, could reasonably believe

that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

The Supreme Court has explained that a "right is clearly established only if its contours are

sufficiently clear that 'a reasonable official would understand that what he is doing violates

that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Anderson v. Creighton*, 483 U.S.

635, 640 (1987)). The unlawfulness of the action at issue must be "apparent" in "light of pre-

existing law." *Anderson*, 483 U.S. 640. In other words, "existing precedent must have placed

the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

In determining whether a right at issue was clearly established for purposes of qualified immunity, courts "must consider not only specifically adjudicated rights, but also those manifestly included within more general applications of the core constitutional principles invoked." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (cleaned up). "In other words, defendants 'can still be on notice that their conduct violates established law even in novel factual circumstances,' so long as the law provided 'fair warning' that their conduct was unconstitutional." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

In this case, the "clearly established" question turns on whether the law, as it existed in September 2020, gave a reasonable state university official "fair warning" that retaliating against a student athlete for engaging in First Amendment expression was unconstitutional. While the U.S. Supreme Court and the Fourth Circuit may not have addressed the novel factual circumstances presented here—i.e., a college coach allegedly retaliating against a player for refusing to kneel with her coaches and teammates in support of perceived unity and social justice—the core constitutional principle is both clearly established and fundamental to a free society, and especially to an institution of higher education. *See Wooley*, 430 U.S. at 714 ("The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" (quoting *Barnette*, 319 U.S. at 637)). That is, it has long been the law that state officials cannot retaliate against individuals or groups, including college students, for exercising their First Amendment rights. *See e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06 (1969) (holding that public school students'

"wearing of an armband for the purpose of expressing certain views is the type of symbolic act that is within the Free Speech Clause of the First Amendment," and that the act "was closely akin to 'pure speech'" and is therefore "entitled to comprehensive protection under the First Amendment"); *Barnette*, 319 U.S. at 642 (finding that compelling public school students to salute the American flag "transcends constitutional limitations . . . and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control"); *Constantine*, 411 F.3d at 499 (holding that a law student adequately alleged First Amendment retaliation when a law school professor gave her an "F" after she criticized the law school's handling of her request for a re-examination); *Saleh v. Upadhyay*, 11 F. App'x 241, 257 (4th Cir. 2001) (holding that a university may not threaten to discharge a professor in retaliation for publishing a paper on discrimination); *Bhattacharya v. Murray*, 515 F. Supp. 3d 436, 456–57 (W.D. Va. 2021) (finding that a medical student sufficiently alleged First Amendment retaliation by the UVA Medical School when he was suspended after challenging a speaker about "microaggressions"). Qualified immunity thus does not protect Adair from suit or entitle him to summary judgment.

## CONCLUSION

For these reasons, the court will deny Adair's motion for summary judgment, and this matter will proceed to trial.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 2nd day of December, 2022.

/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE